**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 26-60022-CR-DIMITROULEAS

UNITED STATES OF AMERICA,
              Plaintiff,
vs.
JOEL LAMM,
              Defendant.
_____/

**DEFENDANT JOEL LAMM'S OBJECTIONS TO THE PRESENTENCE**
**INVESTIGATION REPORT, SENTENCING MEMORANDUM, AND REQUEST FOR A**
**DOWNWARD VARIANCE**

COMES NOW, the Defendant, JOEL LAMM ("Mr. Lamm"), by and through undersigned

counsel, and pursuant to U.S.S.G. § 6A1.2-3, p.s., Fed. R. Crim. P. 32(d), (e)(2), and (f), and the

Fifth Amendment to the United States Constitution, hereby submits his Objections to the

Presentence Investigation Report (PSR, Doc. 77), Sentencing Memorandum, and Request for a

Downward Variance. For the reasons set forth herein, Mr. Lamm respectfully requests that this

Court (i) sustain his objections to the +2 vessel-captain enhancement at PSR ¶ 28 and to the failure

to apply a mitigating-role reduction at PSR ¶¶ 22 and 31; (ii) apply the four-level minimal-role

reduction under U.S.S.G. § 3B1.2(a) and the corresponding base-offense-level reduction under

amended § 2D1.1(a)(5); and (iii) impose a sentence of 30 months' imprisonment, which represents

the bottom of the resulting advisory guideline range of 30 to 37 months and is sufficient, but not

greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a)(2). In the alternative,

should the Court apply the two-level minor-role reduction under § 3B1.2(b), Mr. Lamm

respectfully requests a downward variance under § 3553(a) to the same 30-month sentence. In

support thereof, Mr. Lamm states as follows:

**I.       BACKGROUND**

On March 19, 2026, Mr. Lamm entered a counseled, knowing, and voluntary guilty plea to Count One of the Indictment, which charges conspiracy to import five kilograms or more of cocaine in violation of 21 U.S.C. § 963, a Class A felony. PSR ¶ 1.

Mr. Lamm is a 24-year-old native and lifetime resident of the Commonwealth of the Bahamas. PSR ¶¶ 44–48. He has no prior criminal history of any kind and stands before this Court as a *zero-point offender*. PSR ¶¶ 36, 40. He is in this country solely because of the conduct of conviction and, upon completion of any custodial sentence imposed, he will be removed to the Bahamas, never to return lawfully. PSR ¶¶ 49, 97–98.

The Probation Officer calculates a Total Offense Level of 31 and a Criminal History Category of I, producing an advisory guideline imprisonment range of 108 to 135 months. PSR ¶¶ 37, 40, 70. Mr. Lamm meets the criteria for the safety valve under 18 U.S.C. § 3553(f)(1)–(5) and U.S.S.G. § 5C1.2, and the Government and the Probation Officer have so confirmed; the 10-year statutory minimum at 21 U.S.C. § 960(b)(1)(B) therefore does not apply. PSR ¶¶ 26, 29, 69.

## II.    APPLICATION OF THE SENTENCING FRAMEWORK

Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the federal sentencing process follows a three-step approach: the Court (1) resolves any disputed guideline issues and calculates the advisory range; (2) considers any departure grounds; and (3) considers all of the sentencing factors set forth in 18 U.S.C. § 3553(a) and imposes a sentence "sufficient, but not greater than necessary" to achieve the statutory objectives. *See* Fed. R. Crim. P. 11(M); *United States v. Pugh*, 515 F.3d 1179 (11th Cir. 2008).

While the Court is obligated to correctly calculate and consider the Guidelines, the Guidelines themselves are not binding. The Court is free to vary based on policy disagreement with a particular guideline. *Kimbrough v. United States*, 552 U.S. 85, 109–10 (2007); *Spears v.*

*United States,* 555 U.S. 261, 264 (2009). And, in considering "the history and characteristics of the defendant," the Court is not only *permitted* but *required* to consider the fullest information available about Mr. Lamm's life and circumstances. *Pepper v. United States*, 562 U.S. 476, 480 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 246–47 (1949)); *Koon v. United States*, 518 U.S. 81, 113 (1996). The Court may attach "great weight" to one § 3553(a) factor over others. *United States v. Shaw*, 560 F.3d 1230, 1237 (11th Cir. 2009) (quoting *Gall v. United States*, 552 U.S. 38, 57 (2007)).

### III.     OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

Mr. Lamm respectfully objects to the PSR's application of the +2 vessel-captain enhancement at ¶ 28 and to its failure to apply a mitigating-role reduction under U.S.S.G. § 3B1.2 at ¶¶ 22 and 31. Each objection is dispositive in its own right. Sustaining the captain objection reduces the advisory range to 87–108 months. Sustaining the mitigating-role objection even at the minor-role level reduces the range to 46–57 months. Sustaining both objections at the minimal-role level reduces the range to 30–37 months. Mr. Lamm also notes certain factual corrections to be filed under Fed. R. Crim. P. 32(f)(1).

### A.     Objection to the Two-Level Vessel-Captain Enhancement Under U.S.S.G. § 2D1.1(b)(3)(C) (PSR ¶ 28).

Mr. Lamm objects to the +2 vessel-captain enhancement applied at PSR ¶ 28. The Probation Officer's own narrative recognizes — two pages earlier, at PSR ¶ 6 — that, as part of the written Plea Agreement, "the government and the defendant agreed that the government shall not seek any enhancements for role, special skill, captain or any other potential enhancements." PSR ¶ 6. The Court should honor that bargained-for position. *See Santobello v. New York*, 404 U.S. 257, 262 (1971) ("[W]hen a plea rests in any significant degree on a promise or agreement of

the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.").

Independent of the stipulation, this Court should decline to apply the enhancement as a matter of policy disagreement under *Kimbrough*. The enhancement automatically attaches to every defendant who operates a vessel in a maritime importation case — irrespective of culpability — and thereby converts the lowest-level participant in such an offense into a "captain" for guideline purposes. That is precisely the structural over-punishment of low-level couriers that the Sentencing Commission has now expressly identified — in Amendment 833 — as the problem in § 2D1.1 cases. *See Kimbrough*, 552 U.S. at 109–10; *Spears*, 555 U.S. at 264. The Court may, at minimum, vary downward two levels on this basis under § 3553(a).

The textual structure of U.S.S.G. § 2D1.1(b)(3) reinforces the policy concern. The same two-level enhancement applies, in lockstep, to a defendant who (A) "acted as a pilot, copilot, [or] flight officer" of an aircraft, (B) "embarked, disembarked, or transferred" a controlled substance from a "submersible vessel or semi-submersible vessel," or (C) "acted as a pilot, copilot, captain, navigator, flight officer, or any other operation officer aboard any craft or vessel." U.S.S.G. § 2D1.1(b)(3)(A)–(C). These are not equivalent undertakings. A defendant who pilots an aircraft loaded with cocaine across an international border, a defendant who operates a clandestine cocaine-smuggling submarine, and a defendant who steers a small recreational center-console boat with off-the-shelf GPS over a relatively short distance occupy three radically different positions in the trafficking ecosystem. Treating them identically under § 2D1.1(b)(3) ignores those differences. The Eleventh Circuit has expressly acknowledged that district courts retain authority to vary based on disagreement with the Guidelines' treatment of particular conduct. *See United States v. Irey*, 612 F.3d 1160, 1212 (11th Cir. 2010) (en banc); *United States v. Hunt*, 459 F.3d 1180, 1185 (11th

Cir. 2006). At minimum, the Court should account for the structural over-breadth of § 2D1.1(b)(3) when weighing the § 3553(a) factors and decline to apply the enhancement to Mr. Lamm — a maritime courier who operated a small vessel with commercially available navigational equipment over a relatively short distance, and who has no flight, submarine, or commercial-vessel function whatsoever.

**B.     Objection to the Failure to Apply a Mitigating-Role Reduction Under U.S.S.G. § 3B1.2 (PSR ¶¶ 22, 31): Amendment 833 Is Directly on Point and Compels Relief.**

Mr. Lamm respectfully objects to the Probation Officer's conclusion at PSR ¶ 22 that "[n]either an aggravating nor a mitigating role adjustment [is] recommended" and to the corresponding 0-level entry at PSR ¶ 31. That conclusion cannot be reconciled with the Sentencing Commission's most recent and most consequential drug-sentencing amendment in years: Amendment 833, which became effective on November 1, 2025 — just before Mr. Lamm's arrest — and which materially *expanded* the availability of the § 3B1.2 mitigating-role adjustment in § 2D1.1 cases. This is not a marginal call; Mr. Lamm is the paradigmatic case Amendment 833 was written to address.

*1. The Commission's Empirical Findings and the Reason for Amendment 833.*

Amendment 833 was the product of years of empirical study by the Sentencing Commission. In adopting it, the Commission was explicit about both what the data showed and what it intended to change:

> The purpose of this amendment is to address the inconsistent application of § 3B1.2 in § 2D1.1 cases and to encourage broader use of § 3B1.2 in these cases. The Commission's research indicates that mitigating role adjustments have been applied inconsistently in drug trafficking cases and that the least culpable participants in drug trafficking schemes continue to be punished too severely.

U.S.S.G. App. C, Amend. 833 (Reason for Amendment). Two operational conclusions flow from that text. First, Amendment 833 is corrective. It was promulgated precisely *because* the Commission concluded — based on its own data — that low-level participants like Mr. Lamm were being denied mitigating-role relief far too often. Second, the Commission's amendments to the Guidelines are entitled to substantial deference. The Supreme Court has repeatedly emphasized that the Commission, with its institutional expertise and empirical resources, is the "expert agency" designated to "formulate national sentencing policy." *Mistretta v. United States*, 488 U.S. 361, 391–93 (1989). When the Commission concludes that a particular guideline produces disproportionate sentences and amends the Guidelines to correct course, courts should not silently override the Commission's judgment. *Cf. Kimbrough*, 552 U.S. at 109 (sentencing courts owe particular respect to guidelines reflecting empirical analysis by the Commission).

Probation's flat refusal to apply any mitigating-role adjustment here — issued only six months after Amendment 833 took effect — is in direct tension with the Commission's express directive to "encourage broader use of § 3B1.2 in these cases."

### 2. The Three Operative Changes Made by Amendment 833.

Amendment 833 makes three operative changes to the Guidelines, each of which independently aids Mr. Lamm. First, Subpart 1 amends § 2D1.1(a)(5) so that *any* level of mitigating-role reduction — not just the previously required "minimal participant" designation — triggers a base-offense-level reduction tied to the receipt of the role adjustment. If the defendant receives the 4-level minimal-role reduction under § 3B1.2(a) and the resulting offense level remains greater than 30, the offense level is capped at 30. Second, Subpart 2 inserts a wholly new Special Instruction at § 2D1.1(e)(2)(B). Third, Amendment 833 deletes from the Commentary to § 3B1.2 the former drug-trafficking illustration in Application Note 3(A) — which had provided

that a defendant "whose participation in [the] offense was limited to transporting or storing drugs … may receive an adjustment" — and relocates and elevates that principle into the new, operative Special Instruction at § 2D1.1(e)(2)(B), which expressly names "serving as a courier" as a function for which the four-level adjustment is "generally warranted." The general principle that a defendant accountable under § 1B1.3 only for personal involvement and who performs a limited function in the criminal activity may receive an adjustment remains in Application Note 3(A); that relocation strengthens Mr. Lamm's position, because the courier protection that once appeared only as a commentary example is now stated in operative guideline text.

### 3. The Text of the Special Instruction — and Why It Was Written for This Case.

The new § 2D1.1(e)(2)(B) Special Instruction provides, in pertinent part:

> (B) In addition to the circumstances identified in § 3B1.2, an adjustment under § 3B1.2 is generally warranted if the defendant's primary function in the offense was performing a low-level trafficking function.
>
> (i) An adjustment under § 3B1.2(a) is generally warranted if the defendant's primary function in the offense was plainly among the lowest level of drug trafficking functions, such as serving as a courier, running errands, sending or receiving phone calls or messages, or acting as a lookout; or
>
> (ii) an adjustment under § 3B1.2(b) is generally warranted if the defendant's primary function in the offense was performing another low-level trafficking function . . . .

U.S.S.G. § 2D1.1(e)(2)(B). Three features of the Special Instruction are particularly relevant here.

First, the Special Instruction *expressly enumerates* "serving as a courier" as the first example of a function for which the four-level minimal-role adjustment under § 3B1.2(a) is "generally warranted." That is not dicta; that is the Commission, in operative guideline text, naming the conduct.

Second, the Special Instruction *eliminates* the principal pre-Amendment defense to a courier's minor-role claim. The text provides that the adjustment "shall apply regardless of whether the offense involved other participants in addition to the defendant, and regardless of whether the defendant was substantially less culpable than the average participant in the criminal activity." *Id.* For two decades, the government's standard argument against minor role in courier cases was that the defendant could not be shown to be "substantially less culpable than the average participant." *See, e.g., United States v. De Varón*, 175 F.3d 930, 944 (11th Cir. 1999) (en banc). Amendment 833 forecloses that argument in any case fitting the (e)(2)(B) safe harbor.

Third, the use of the phrase "generally warranted" signals a strong default in favor of the adjustment. The Commission did not merely say a courier *may* receive the adjustment; it instructed that the adjustment *is* warranted unless there is some specific reason for denial. None has been articulated in the PSR.

Fourth, the Commission's own empirical findings confirm that the *four-level* minimal-role reduction Mr. Lamm seeks — not merely the two-level reduction — is the relief Amendment 833 was designed to make available in exactly this situation. In promulgating the amendment, the Commission found that "when § 3B1.2 is applied in § 2D1.1 cases, the vast majority of these cases receive only a 2-level reduction; 3- and 4-level reductions are rarely applied," and that application of the adjustment varied markedly "across districts." *U.S.S.G. App. C, Amend. 833* (Reason for Amendment). The Commission selected the defendant's "primary function" as the operative touchstone precisely "to ensure courts focus on a defendant's predominant trafficking-related activities," and made clear that the enumerated examples — "serving as a courier" first among them — are "illustrative rather than a definitive list." *Id.* To confine a paradigmatic courier such

as Mr. Lamm to the two-level reduction that was routinely applied *before* the amendment would reproduce the very inconsistency the Commission expressly set out to correct.

The Sentencing Commission's commentary supplies the operative description in its own words. The Guideline provides that a mitigating-role adjustment "is generally warranted if the defendant's primary function in the offense was plainly among the lowest level of drug trafficking functions, such as serving as a courier." U.S.S.G. § 2D1.1(e)(2)(B)(i). The commentary to § 3B1.2, in turn, provides that "[a] defendant who is accountable under § 1B1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in the criminal activity may receive an adjustment under this guideline," U.S.S.G. § 3B1.2 cmt. n.3(A), and that "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline," id. cmt. n.3(C). These descriptions fit Mr. Lamm precisely: his function was limited to operating the vessel, he held no proprietary interest in the cocaine, the vessel, or the destination warehouse, and he was simply paid to perform that task at the direction of others. PSR ¶¶ 19, 21.

### 4. The PSR Itself Establishes Each Element of the Safe Harbor.

The PSR's own offense-conduct narrative establishes — without dispute and without need for outside evidence — every element of the § 2D1.1(e)(2)(B)(i) safe harbor. Working through the elements:

***a. Mr. Lamm's "primary function" was that of a courier.*** The Probation Officer himself, in the Role Assessment at PSR ¶ 22, writes: "Lamm operated the vessel which brought the cocaine from the Bahamas to the United States." That is a textbook courier description. He had no other function — no logistics role, no warehousing role, no recruiting role, no security role.

***b. Co-defendant Neely owned the cocaine.*** The PSR's most pivotal — and overlooked — finding is at ¶ 19, where the Probation Officer recounts that, post-*Miranda*, Neely admitted that he "(Neely) was at the dock to oversee his vessel getting picked up" and that "the vessel and its contents (cocaine) were to be brought back to *his* warehouse in Plantation and unloaded." PSR ¶ 19 (emphasis added). The Probation Officer then concludes: "Further investigation identified *Neely* as the individual responsible for coordinating the maritime transport of the cocaine and its delivery to the warehouse location." *Id.* In short, Neely owned the vessel, owned the warehouse, owned the cocaine, and coordinated the transport. Mr. Lamm was the hired courier paid to drive the boat.

***c. Mr. Lamm was directed by others, not directing them.*** The PSR documents that the "[t]ext messages and voice recordings on Lamm's phone show he was being guided by somebody else to avoid law enforcement officers upon arrival." PSR ¶ 21. He was receiving directions in real time, not giving them. That is the antithesis of leadership conduct.

***d. Mr. Lamm was compensated as a hired courier, not as a principal.*** The PSR documents that Mr. Lamm was a paid hand — recruited and compensated to operate the boat. PSR ¶¶ 20–21. He had no ownership stake in the cocaine, the vessel, or the warehouse; he held no share in the wholesale value of the seized 165 kilograms; and he had no continuing economic interest in the enterprise. The principal economic beneficiary of the scheme was, plainly, the owner of the cocaine — Neely.

The Commentary to § 3B1.2 speaks directly to this fact pattern. Application Note 3(C) instructs that, in weighing the degree to which a defendant "stood to benefit from the criminal activity," "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered" for a mitigating-role adjustment.

*U.S.S.G. § 3B1.2 cmt. n.3(C)*. That description fits Mr. Lamm precisely: he held no proprietary interest in the cocaine, the vessel, or the warehouse, and was "simply being paid to perform" the single, discrete task of operating the boat. The Commission's 2025 *Primer on Aggravating and Mitigating Role Adjustments* confirms the point, recognizing that couriers and mules "may receive" an adjustment under § 3B1.2 "even if they are held accountable for only the quantity of drugs they personally transported." U.S. Sent'g Comm'n, *Primer on Aggravating and Mitigating Role Adjustments* 20 (2025).

**e. Mr. Lamm had no firearms, weapons, or other contraband connection.** The loaded Glock found in Neely's van, the two rifles, the loaded handgun, the gun parts, the magazines, the vacuum-sealed marijuana, and the baton recovered from Neely's warehouse — none of that contraband had any connection to Mr. Lamm. PSR ¶¶ 17–18. Mr. Lamm was, *at most*, a one-task courier paid to operate a vessel.

Each of these factual findings is taken directly from the PSR itself. The Probation Officer's refusal to apply mitigating role despite his own offense-conduct narrative establishing every element of the (e)(2)(B)(i) safe harbor is, with respect, unsustainable. The fit between Amendment 833's text and Mr. Lamm's conduct is not merely good — it is exact.

**5. The Eleventh Circuit Already Required Mitigating Role on Less Compelling Facts.**

Even before Amendment 833, the Eleventh Circuit required mitigating-role consideration for maritime drug couriers on facts considerably less compelling than these. In *United States v. Cruickshank*, 837 F.3d 1182, 1194–96 (11th Cir. 2016), the Eleventh Circuit reversed the denial of a minor-role adjustment to a maritime cocaine courier, emphasizing the role factors codified in § 3B1.2 cmt. n.3(C). The en banc panel in *De Varón* held that drug quantity is *not* dispositive of the role inquiry — the proper measure is the defendant's conduct against the average participant.

175 F.3d at 945. Amendment 833 codifies and *fortifies* those principles by (a) abandoning the "average participant" comparator altogether and (b) naming couriers in operative guideline text. Probation's conclusion that no mitigating-role adjustment is warranted is incompatible with both *Cruickshank* and Amendment 833 as a matter of law.

Anticipating the Government's likely position — that the sheer quantity of cocaine recovered forecloses any mitigating-role reduction — Mr. Lamm submits that the argument fails as a matter of law. Drug quantity is, to be sure, a relevant consideration; the Eleventh Circuit has recognized that the "amount of drugs . . . is a material consideration in assessing a defendant's role in [his] relevant conduct," and may even be "dispositive" in the "extreme" case. *United States v. Rodriguez De Varón*, 175 F.3d 930, 943 (11th Cir. 1999) (en banc). But quantity is a factor, not a trump card. It is "legal error" to deny a mitigating-role reduction on the ground that drug quantity "is the only factor to be considered." *United States v. Cruickshank*, 837 F.3d 1182, 1195 (11th Cir. 2016) (vacating and remanding where the district court treated the quantity of cocaine as decisive of role). The reason is structural: drug quantity is already fully accounted for in the base offense level under U.S.S.G. § 2D1.1(c), while the § 3B1.2 inquiry asks the distinct question of the defendant's functional role — which Amendment 833 now measures by the defendant's "primary function," not by volume. U.S.S.G. § 2D1.1(e)(2)(B)(i). Nor do the large-quantity maritime decisions counsel otherwise. In *United States v. Martinez*, 172 F.4th 1306 (11th Cir. 2026), and *United States v. Carreno Fernandez*, No. 23-12337, 2026 WL 278481 (11th Cir. Feb. 3, 2026) (per curiam), the Eleventh Circuit sustained the denial of mitigating-role reductions to defendants who navigated vessels carrying, respectively, approximately 375 kilograms and over a ton — 955 kilograms — of cocaine. Those quantities dwarf the 165 kilograms at issue here, and those defendants were co-equal mariners acting for a substantial promised payment, not directed, non-

owning couriers. *Martinez,* moreover, applied the pre-Amendment 833 "average participant" comparator that the Eleventh Circuit has since held Amendment 833 abrogated. 172 F.4th at 1316. The quantity attributed to Mr. Lamm is therefore a factor this Court must weigh — but on this record, where he owned nothing, coordinated nothing, and was directed by others in real time (PSR ¶ 21), it cannot bear the dispositive weight the Government would place upon it.

### 6. Co-Defendant Disparity Reinforces the Need for the Adjustment.

Section 3553(a)(6) directs this Court to avoid unwarranted sentencing disparities. The disparity between Mr. Lamm and his sole charged co-defendant, Neely, is stark. As detailed in the PSR:

- Neely *owned* the vessel that was used to transport the cocaine. PSR ¶¶ 9–10.
- Neely *owned* the warehouse where the cocaine was to be unloaded. PSR ¶¶ 12, 18.
- Neely *owned* the cocaine itself. PSR ¶ 19 ("the vessel and its contents (cocaine) were to be brought back to his warehouse").
- Neely was "the individual responsible for *coordinating* the maritime transport of the cocaine and its delivery to the warehouse location." PSR ¶ 19.
- Neely conducted counter-surveillance from a gray Dodge van at the boat ramp on the date of seizure. PSR ¶ 17.
- A loaded Glock was recovered from Neely's van; two rifles, a loaded handgun, gun parts, magazines, marijuana, and a baton were recovered from Neely's warehouse. PSR ¶¶ 17–18.

Mr. Lamm, by contrast, owned nothing, coordinated nothing, possessed no firearms, and operated as a hired courier directed by others. The Probation Officer's recommendation that *the same role treatment* — zero adjustment — be applied to the owner-operator-principal and to the hired courier is itself an unwarranted disparity that § 3553(a)(6) directs this Court to avoid.

### 7. The Numerical Impact.

Under Amendment 833, sustaining Mr. Lamm's mitigating-role objection produces the following guideline calculation:

| Step | PSR | Minor Role | Minimal Role |
|---|---|---|---|
| Base offense level (§ 2D1.1(c)(2)) | 36 | 36 | 36 |
| Amendment 833 cap (§ 2D1.1(a)(5)) | — | −4 (to 32) | −6 (to 30) |
| Mitigating role (§ 3B1.2) | 0 | −2 | −4 |
| Captain enhancement (§ 2D1.1(b)(3)(C)) | +2 | 0 | 0 |
| Safety valve (§ 2D1.1(b)(18)) | −2 | −2 | −2 |
| Acceptance (§ 3E1.1(a)–(b)) | −3 | −3 | −3 |
| Zero-point offender (§ 4C1.1) | −2 | −2 | −2 |
| Total Offense Level | 31 | 23 | 19 |
| Range (CHC I) | 108–135 mo. | 46–57 mo. | 30–37 mo. |

Probation's contrary position — that *no* mitigating-role adjustment is warranted for the courier who did not own the vessel, the warehouse, or the cocaine, who was directed by others by text and voice message, and who was paid to operate the boat — cannot be reconciled with Amendment 833's text, its stated purpose, the offense-conduct narrative the Probation Officer himself authored, or controlling Eleventh Circuit precedent. The objection should be sustained at the minimal-role level under § 3B1.2(a); at minimum, the minor-role reduction under § 3B1.2(b) is plainly warranted.

### C.      Factual Objections and Clarifications Pursuant to Fed. R. Crim. P. 32(f)(1).

Mr. Lamm submits the following factual corrections and clarifications:

***PSR ¶ 45.*** Mr. Lamm respectfully clarifies that the statement at the close of PSR ¶ 45 — that he "did not suffer any trauma or abuse during his upbringing" — refers solely to the absence of physical or sexual childhood abuse and does *not* negate the documented trauma history later described in PSR ¶¶ 52–53, including the cumulative loss of his grandmother (2021), father (2022), older brother Jason Lamm to gun violence (2024), and maternal grandfather (2024).

*PSR ¶ 46.* The Probation Officer identifies Mr. Lamm's sister as "Rosha Sands" and lists her employment as "receptionist." The correct name is Risha (Sands) Lamm, and her position at Doctors Hospital in Nassau is lead client service representative. The spelling of "Brandon Lamm" should likewise be confirmed against family records (the family spells the name "Branden"). Mr. Lamm also notes that the PSR identifies three full siblings and two paternal half-siblings; counsel will confirm the full/half distinction with the family.

*PSR ¶¶ 51–53.* The Probation Officer notes that the medical discharge summaries from Doctors Hospital, Nassau, and the Broward County Jail North Broward Bureau are still "pending." Counsel has separately requested those records and will supplement this Memorandum upon receipt. Counsel notes that Mr. Lamm's May 2025 admission to Doctors Hospital — described at PSR ¶ 52 — resulted in formal diagnoses of acute anxiety and adjustment disorder, with documented psychosocial stressors including (i) the deaths, in rapid succession, of his maternal grandmother Bernadette Brown (2021), his father Noel Lamm (2022), his older brother Jason Lamm to gun violence (2024), and his maternal grandfather Ronald Brown (2024); (ii) ongoing grief and unresolved trauma; (iii) impending fatherhood; and (iv) marijuana use as a coping mechanism. Mr. Lamm initially pursued therapy but discontinued it due to cost.

*PSR ¶ 55.* The PSR states that "his high school, Akhepran International Academy, made him attend a drug rehabilitation program." Counsel respectfully clarifies that the referral to drug counseling was made by Mr. Lamm's prior high school — Doris Johnston High School in Nassau — which he attended before transferring to Akhepran International Academy, from which he ultimately graduated in 2019. The chronology of the referral therefore predates his enrollment at Akhepran.

***PSR ¶ 59.*** Mr. Lamm clarifies that, in addition to LLS Landscaping and Runtings Car Rental, he founded a third venture, Sun Chaser Watersports, in Nassau. Counsel will confirm the current operating status of that business and supplement the record.

***PSR ¶ 78.*** The Probation Officer states that "no factors" warranting a sentence outside the advisory guideline range have been identified. Mr. Lamm respectfully disagrees and incorporates by reference the § 3553(a) factors set forth in Section V below, which both individually and cumulatively warrant a downward variance.

## IV.  BASIS FOR A DOWNWARD DEPARTURE PURSUANT TO U.S.S.G. § 5K1.1

As contemplated in Paragraph 5 of the Plea Agreement (described at PSR ¶ 5), the Government may file a motion for downward departure pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e) based on the quality and significance of Mr. Lamm's cooperation. Should the Government do so, undersigned counsel will provide additional detail at sentencing.

Independent of any § 5K1.1 motion, this Court may consider Mr. Lamm's post-*Miranda* statements to law enforcement (PSR ¶¶ 20–21) and his complete and truthful safety-valve debrief with the United States Attorney's Office (PSR ¶ 26) as a basis for a downward variance under § 3553(a). *See United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006); *United States v. Knox*, 573 F.3d 441 (7th Cir. 2009); *United States v. Doe*, 398 F.3d 1254, 1260–61 (10th Cir. 2005); *United States v. Barner*, 572 F.3d 1239 (11th Cir. 2009).

## V.  APPLICATION AND CONSIDERATION OF THE 18 U.S.C. § 3553(A) FACTORS

Under 18 U.S.C. § 3553(a), this Court must impose a sentence sufficient, *but not greater than necessary,* to comply with the purposes of sentencing set forth in subsection (a)(2). The "sufficient, but not greater than necessary" command — known as the "parsimony principle" — is not aspirational language. It is a statutory mandate. *See* 18 U.S.C. § 3553(a); *Kimbrough*, 552

U.S. at 101; *United States v. Irey*, 612 F.3d 1160, 1196 (11th Cir. 2010) (en banc) (parsimony principle is an "'overarching' instruction").

In considering the "history and characteristics of the defendant," the Court is *required* to consider the fullest information available about Mr. Lamm's life and circumstances. *Pepper*, 562 U.S. at 480 (the Court must possess the "fullest information possible concerning the defendant's life and characteristics" (quoting *Williams*, 337 U.S. at 246–47)); *Koon*, 518 U.S. at 113 ("every convicted person [is] an individual and every case a unique study"). The Court is not required to assign equal weight to each factor, and is permitted to attach "great weight" to one or more factors over others. *Shaw*, 560 F.3d at 1237 (quoting *Gall*, 552 U.S. at 57). The mitigating factors here, taken together, present an exceptional case warranting a substantial downward variance.

**1. The Nature and Circumstances of the Offense; Co-Defendant Disparity.**

***Offense Conduct.*** Mr. Lamm was arrested on January 7, 2026 following the interception of co-defendant Neely's vessel returning from international waters toward Fort Lauderdale. PSR ¶ 16. He was the sole occupant; he cooperated with CBP agents; and 165 kilograms of cocaine were recovered from inside the center console. PSR ¶¶ 16, 20. He has remained in continuous federal custody since that date. Mr. Lamm's role was that of a hired courier, recruited and directed by others (PSR ¶ 21), with no ownership of the vessel, the warehouse, the cocaine, or any other component of the broader scheme.

***Speedy Resolution and Acceptance of Responsibility.*** Mr. Lamm did not put the Government to its burden. From the moment of his arrest, he cooperated. He gave a post-*Miranda* statement on the day of his arrest, providing investigators with the details of his recruitment, the December 20, 2025 prior trip, and his understanding of Neely's operation. PSR ¶¶ 20–21. On March 19, 2026 — just over two months after his arrest — he entered a written Plea Agreement

and Factual Proffer and pled guilty, accepting the certainty of a custodial sentence. He thereafter submitted to a complete and truthful safety-valve debrief with the United States Attorney's Office. PSR ¶ 26. The Probation Officer recommends the full three-level reduction under § 3E1.1. PSR ¶¶ 34–35. The acceptance here is not pro forma; it is *extraordinary*. The Eleventh Circuit and the Sentencing Commission both recognize that extraordinary acceptance — beyond what is captured by § 3E1.1 — may itself be a basis for variance. *See United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (Rakoff, J.) (acceptance of responsibility is among the "most important" § 3553(a) considerations).

***Disparity with Co-Defendant Neely (§ 3553(a)(6)).*** Section 3553(a)(6) directs this Court to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The conduct of co-defendant Johnathan Wesley Neely (PACTS #10683653, sentencing scheduled July 13, 2026) is, on the face of the PSR, profoundly different from Mr. Lamm's. Neely owned the vessel and the warehouse; Neely owned the cocaine; Neely coordinated the importation logistics; Neely conducted counter-surveillance; and Neely possessed a loaded Glock and a cache of additional firearms, marijuana, and gun parts. PSR ¶¶ 9–10, 12, 17–19. Mr. Lamm, by contrast, was a hired courier who did not own anything, coordinated nothing, possessed no firearms, and was being guided by another by text and voice message. PSR ¶¶ 20–21. Sentencing Mr. Lamm under the same guideline framework as Neely — which is what Probation's zero-role-adjustment recommendation effectively does — would itself create an unwarranted disparity.

### 2. The History and Characteristics of Joel Lamm.

***Personal and Family History.*** Mr. Lamm is a 24-year-old lifelong resident of Nassau, Bahamas. PSR ¶¶ 44–48. He has never lived in the United States; his only presence here is the

product of the offense of conviction. He is the son of Noel Lamm (deceased) and Rochelle Rolle Lamm, who works at Scotia Bank in Nassau. Mr. Lamm's parents amicably separated when he was approximately 11 to 12 years old. Following the separation, Mr. Lamm was reared by his mother — who worked long hours outside the home — with substantial caregiving from his maternal grandmother, Bernadette Brown, who served as the primary daytime caregiver throughout his childhood despite a back disability.

Mr. Lamm's father, Noel Lamm, struggled with alcoholism throughout much of his life. The family has a multi-generational propensity toward alcohol addiction among the males. Ms. Rolle described Mr. Lamm's father as a functioning alcoholic whose addiction was the principal cause of the failure of their marriage. After the separation, Mr. Lamm's father relocated to one of the Bahamian out-islands, where he held a series of unstable jobs and was an unreliable source of child support. Mr. Lamm spent extended periods of time with him during school breaks. On September 6, 2022, Mr. Lamm's father died of a stroke or heart attack at age 52. PSR ¶ 45.

***The Recent Trauma Chronology.*** What follows in the record is, in the most literal sense, an *extraordinary* trauma chronology. In the five years immediately preceding the offense of conviction, Mr. Lamm — a young man who turned 24 just six months before his arrest — experienced a sustained cascade of catastrophic personal events. Each loss followed close on the heels of the last. None has been resolved; each compounds the next. The chronology is briefly set forth here, and then unpacked in the subsections that follow.

> **February 15, 2021 (age 19):** Mr. Lamm is struck by a motor vehicle while on his motorcycle. He sustains a catastrophic crush injury to his right lower extremity and is hospitalized at Doctors Hospital, Nassau. PSR ¶ 51.
>
> **February 25 – March 2021:** Mr. Lamm is transferred by air ambulance to Cira Garcia, Cuba — alone, isolated under COVID-19 restrictions, and

unable to see family for nearly three weeks. He undergoes a below-knee amputation of his right lower extremity. PSR ¶ 51.

**2021 (later that year):** While Mr. Lamm is still recovering from the amputation, his maternal grandmother and primary daytime caregiver throughout his childhood, Bernadette Brown — the person he describes as his "guiding light" — dies of COVID-related complications.

**September 6, 2022 (age 21):** Mr. Lamm's father, Noel Lamm, dies of a stroke or heart attack at age 52. PSR ¶ 45.

**2024:** Mr. Lamm's older brother, Jason Lamm, age 24, is shot and killed in Nassau. PSR ¶ 46. The same year, Mr. Lamm's maternal grandfather, Ronald Brown, dies.

**May 2025:** The accumulation of medical, financial, relational, and grief-related stressors precipitates an acute psychiatric episode. Mr. Lamm is admitted to Doctors Hospital, Nassau, and is formally diagnosed with acute anxiety and adjustment disorder. PSR ¶ 52.

**January 7, 2026 (age 24):** The instant offense conduct and arrest.

Four catastrophic losses — his maternal grandmother and primary daytime caregiver, Bernadette Brown (2021); his father, Noel Lamm (2022); his older brother, Jason Lamm, shot and killed in Nassau at age 24 (2024); and his maternal grandfather, Ronald Brown (2024) — occurred during the same window in which Mr. Lamm was simultaneously learning to live as a below-knee amputee. These were not distant relatives. They were the four pillars of stability in Mr. Lamm's life. They were the people who had supplied the firm boundaries and expectations that had kept Mr. Lamm out of trouble through his teen years. By the end of 2024, every one of them was gone.

And the timing matters. The first loss — Bernadette Brown — occurred while Mr. Lamm was still in active rehabilitation from the amputation. The second — his father — came barely a year later, when the prosthesis was still new and ill-fitting. By the time the recruiters who built Neely's organization approached him, Mr. Lamm was a 24-year-old below-knee amputee, in chronic nerve and phantom pain, who had buried the four people closest to him within three years, who had untreated acute anxiety and adjustment disorder, and who was supporting two infants on

whatever income two small Nassau-based businesses could produce. He was, in clinical terms, a young man in crisis.

The depth of that trauma remains evident today. While reviewing a draft of this Memorandum with undersigned counsel — confronting the chronology of his catastrophic injury, the surgical loss of his right leg below the knee, and the deaths of his grandmother, his father, his older brother, and his grandfather, all set out in a single recitation — Mr. Lamm became visibly emotional and had to ask counsel to pause. That reaction is not strategic; it is unprocessed grief, freshly disturbed by the act of seeing it laid down on the page. Five years after the motorcycle accident and barely two years after burying his brother, Mr. Lamm has not yet been able to grieve any of it under conditions of stability.

Courts in this Circuit and elsewhere have repeatedly recognized that cumulative familial loss — particularly cumulative loss that overlaps with disability, mental-health vulnerability, and economic hardship — is a powerful § 3553(a)(1) mitigating factor. *See, e.g., United States v. Bannister*, 786 F. Supp. 2d 617, 691–92 (E.D.N.Y. 2011) (Weinstein, J.) (cumulative loss and disadvantage warrant downward variance); *United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006) (defendant's "overall life hitherto" is properly weighed); *Koon*, 518 U.S. at 113 (every case is a "unique study"). The trauma chronology set forth above is not contextual color; it is, in the words of *Pepper*, "highly relevant — if not essential — to the selection of an appropriate sentence." 562 U.S. at 480.

Mr. Lamm has four surviving siblings — Noel Lamm, Sr.; Navantae Lamm (employed with the Royal Bahamian Defense Force); Risha (Sands) Lamm (employed as a lead client service representative at Doctors Hospital, Nassau); and Branden Lamm (a graphic designer) — all of whom reside in Nassau. PSR ¶ 46. The family is close and mutually supportive.

Mr. Lamm is the father of two young children — Noel Alou Lamm (age 2) and Ariel Sarara Lamm (age 1) — with Courtney Symonette, with whom he was in an on-and-off relationship from 2017 to 2025. PSR ¶ 47. Ms. Symonette resides in Nassau and works as a hairdresser. Prior to his incarceration, Mr. Lamm shared parenting responsibilities; his daughter spent weekends with him and his son lived with him. He and Ms. Symonette remain in close daily contact. The disruption of his presence in those children's lives is itself a mitigating consideration. *See United States v. Johnson*, 964 F.2d 124, 128–30 (2d Cir. 1992) (courts are "reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing"); *United States v. DeRoover*, 36 F. Supp. 2d 531, 532–33 (E.D.N.Y. 1999).

***The Trauma of Losing His Leg — A Below-Knee Amputation at Age 19.*** No description of Mr. Lamm is complete without an account of what happened to him on the afternoon of February 15, 2021, and in the long, isolated months that followed. Mr. Lamm was 19 years old. He was riding a motorcycle in Nassau when a motor vehicle struck him. The collision did not merely break his right lower extremity — it *crushed* it. The PSR describes the result in clinical shorthand ("catastrophic crush injury"), but the medical record paints the actual picture: a partial traumatic amputation of the right foot at the scene, extensive soft-tissue destruction, exposed bone, vascular compromise, and the immediate clinical question of whether the limb could be saved at all. PSR ¶ 51.

Mr. Lamm was admitted to Doctors Hospital, Nassau. Physicians worked aggressively to save the leg — pain management, intravenous fluids, broad-spectrum antibiotics, debridement after debridement, orthopedic and surgical consultation. For days, the clinical record reflects the staff's hope that the limb might yet be salvaged. The hope did not hold. The right foot and ankle exhibited progressive vascular insufficiency, the soft tissue continued to die, and the risk of

systemic sepsis became impossible to ignore. By February 24, 2021, the consensus among the surgical and orthopedic teams was that limb salvage had failed and that a below-knee amputation was medically necessary to prevent sepsis and death.

Mr. Lamm and his family refused to surrender. At their request — and at significant family financial sacrifice — Mr. Lamm was transferred on February 25, 2021 by air ambulance to Cira Garcia, Cuba, for advanced care. He was hospitalized there for approximately three weeks. The infection worsened. Despite every effort, the limb could not be saved. While in Cuba, Mr. Lamm underwent a below-knee amputation of his right lower extremity. He was 19 years old.

The amputation was not, however, the worst of it. The *trauma* of losing the leg was compounded — incalculably — by the conditions under which it occurred. These events unfolded during the height of COVID-19 restrictions. Mr. Lamm's mother was permitted to accompany him on the air-ambulance flight from the Bahamas to Cuba, but upon arrival, hospital visitation rules separated them. She did not see her son again for nearly three weeks. For nearly a month, Mr. Lamm — 19 years old, in a foreign country, in a foreign-language hospital, with no family present — endured the surgical loss of his right leg below the knee in functional isolation. He woke up from anesthesia alone. He learned that the limb had not been saved alone. He began the earliest stages of grief — for a limb, for a body, for a future he had imagined — alone. The clinical record from this period documents not only the amputation itself, but the formal diagnosis of adjustment disorder arising from the traumatic nature of the incident and the profound implications of permanent limb loss.

The trauma of the amputation did not end when Mr. Lamm returned to the Bahamas. It is, on this record, a permanent feature of his life. Approximately eight months passed before he received a prosthetic limb at all. PSR ¶ 51. Adjusting to a below-knee (transtibial) prosthesis is

itself a gradual and painful process that requires consistent residual-limb care, repeated refitting, and persistent management of skin breakdown and nerve pain. Mr. Lamm's current prosthesis *does not fit properly*. PSR ¶ 51. The resulting gait impairment has caused secondary hip-joint complications and threatens permanent hip injury. More gravely still, the residual limb's *bone has begun to protrude* — to physically push through the soft tissue covering the stump. PSR ¶ 51. The probable corrective intervention is a *revision amputation above the knee* — meaning that Mr. Lamm, who has already lost his right leg below the knee, may lose still more of it. PSR ¶ 51.

And the pain has not stopped. Mr. Lamm continues to experience nerve pain and phantom pain in his residual right leg. PSR ¶ 51. Phantom pain is precisely what it sounds like: the perception of pain in a limb that is no longer there. It is, for many amputees, lifelong. The Broward County Jail is presently providing him only over-the-counter Tylenol for that pain. PSR ¶ 51.

Mr. Lamm's physical-health history is, in any reasonable assessment, "extraordinary" within the meaning of U.S.S.G. § 5H1.4. Federal courts have repeatedly recognized that a serious physical disability — particularly one that imposes *additional* suffering during incarceration that would not be experienced by a non-disabled defendant — is a proper basis for downward variance. *See United States v. Martin*, 363 F.3d 25, 49–50 (1st Cir. 2004) (medical condition warranting downward departure); *United States v. Gee*, 226 F.3d 885, 902 (7th Cir. 2000) (same); *United States v. Sclamo*, 997 F.2d 970, 974 (1st Cir. 1993) (extraordinary physical impairment warrants departure).

The disability also bears directly on the question of how Mr. Lamm came to be in the position he is in. The PSR documents that, after the amputation, Mr. Lamm fell into "a deep depression and frequent anxiety," and was specifically "worried . . . that losing his right leg w[ould] ma[ke] him unemployable and shunned." PSR ¶ 52. That fear was not paranoia; it was an entirely

rational response to the lived reality of being a 19-year-old below-knee amputee with no insurance, mounting medical bills, an unstable family financial position, and no clear pathway to legitimate income. The same chronology that produced the amputation produced the conditions in which Mr. Lamm was vulnerable to being recruited by Neely's operation. That is not an excuse for the offense — Mr. Lamm has accepted full responsibility for the offense — but it is *context*, and § 3553(a)(1) requires this Court to consider it.

*Mental Health History.* Mr. Lamm carries a documented history of depression, acute anxiety, and adjustment disorder. PSR ¶¶ 52–53. He first experienced depression as a child in connection with his parents' separation. After the 2021 amputation, he fell into a deep depression and frequent anxiety, fearing he would be unemployable and ostracized. PSR ¶ 52. In May 2025, the accumulation of medical, financial, relational, and grief-related stressors precipitated an acute anxiety episode that resulted in his hospitalization at Doctors Hospital, Nassau. PSR ¶ 52. He was diagnosed with acute anxiety and adjustment disorder, prescribed medication, and referred to outpatient therapy — therapy he could not afford to continue. He is currently receiving monthly mental-health services at the Broward County Jail. PSR ¶ 53. Mental-health vulnerability is a recognized § 3553(a)(1) consideration. *See United States v. Mateo*, 299 F. Supp. 2d 201, 209 (S.D.N.Y. 2004) (Lynch, J.) (mental-health history is properly considered); *Pepper*, 562 U.S. at 480 (rehabilitation-relevant evidence is essential to sentencing).

*Substance-Abuse History.* Mr. Lamm began using marijuana at age 15 and used it daily until his arrest on January 7, 2026. PSR ¶ 54. His use intensified to multiple times per day. While he was a student at his first high school, Doris Johnston High School in Nassau, the school referred him to drug counseling; he did not complete the program, although he ultimately graduated from Akhepran International Academy in 2019. PSR ¶¶ 55–56. The PSR documents that marijuana use

was, at least in part, a coping mechanism for the trauma chain described above (PSR ¶ 52). Mr. Lamm respectfully requests that this Court recommend his placement in substance-abuse treatment within the Bureau of Prisons, to the extent such treatment is available to non-citizen detainees subject to removal.

*Education, Vocational Training, and Entrepreneurship.* Mr. Lamm graduated from Akhepran International Academy in 2019. He completed Phase One of the plumbing program at the Bahamas Technical Institute in 2021 and attended boat-training at Gadites Maritime and Vocational Institute from 2022 to 2024. PSR ¶ 56. Despite his permanent disability and the cumulative familial losses he was sustaining, Mr. Lamm built two small businesses: he is the co-owner of LLS Landscaping (since June 2025, with his mother) and Runtings Car Rental (since 2023, with his brother Branden). PSR ¶¶ 59–60. Both businesses remain in operation under the management of family members and stand ready to provide employment to Mr. Lamm upon his return to the Bahamas. He also founded Sun Chaser Watersports; counsel will supplement the record as to the status of that venture. Mr. Lamm's entrepreneurial efforts — particularly in light of his disability — are themselves evidence of work ethic and rehabilitative potential. *See United States v. Cooper*, 394 F.3d 172, 176–77 (3d Cir. 2005) (defendant's good works and community contributions properly considered).

### 3. Character Letters and Community Support.

Numerous character letters from family members, friends, employers, clergy, and community leaders have been submitted with this Memorandum and are attached as Attachment A. As Judge Jed Rakoff has observed, "if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*,

441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006). The letters present a consistent and compelling portrait of a young man committed to family, possessed of a reliable work ethic, and demonstrably capable of growth, rehabilitation, and recovery from adversity. Representative excerpts follow.

Donella Bethel recognizes Mr. Lamm as someone who "approached his work with diligence, reliability, and determination . . . industrious and dependable," reflecting "a person who takes pride in honest work and accountability." Tiffany Seymour describes him as "a hardworking and dependable individual . . . [who] approached his work with dedication and integrity." Courtney Symonette recalls that Mr. Lamm endured physical pain and emotional hardship, yet "continued to work hard to provide for his family."

Dr. Omar Armbrister describes Mr. Lamm as "a respectful, humble, and well-mannered individual." Lesley Neely explains that he has "consistently shown honesty and consideration toward others . . . ." Lutricia Campbell states that Mr. Lamm "carries himself with humility and accountability." Angelo Brown writes that "Joel is a respectful individual who has always lived a life that any parent would be proud of, he has never had any run ins with law enforcement in his life, not even so much [as] a citation for anything before finding himself in this unfortunate situation."

The letters overwhelmingly emphasize Mr. Lamm's devotion to his family. Tiffany Seymour writes that he "places great importance on maintaining strong family bonds." Ms. Symonette confirms he is "a dedicated father and provider who consistently places his family first." Amy Lamm-Woodside reinforces that his children "mean the world to him." Dr. Armbrister describes Mr. Lamm assuming responsibility as a father figure beyond his immediate household.

The letters chronicle the extraordinary personal hardship that has marked Mr. Lamm's life — the amputation, the cumulative deaths of close family members, and persistent financial

pressure — yet uniformly emphasize his resilience. Risha Sands writes of the cumulative weight of those losses. Lesley Neely describes his "perseverance and strength" as "truly inspiring." Dr. Armbrister describes Mr. Lamm as "remorseful" and as having expressed "deep sadness and regret," along with "a sincere commitment to improving himself." Donella Bethel affirms that he is "capable of reflection, growth, and continued positive contribution."

### 4. The Need for Just Punishment, Deterrence, and Protection of the Public.

*Deterrence.* Mr. Lamm fully appreciates the consequences of his actions and has vowed never to repeat them. Given his complete inexperience with the criminal-justice system — he is, in the precise language of § 4C1.1, a zero-point offender — he is likely to be far more impressionable than a repeat offender already familiar with the circumstances of imprisonment. *See United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("[G]enerally a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to reoffend."); *United States v. Baker*, 445 F.3d 987, 990 (7th Cir. 2006) (first prison experience has greater impact than later ones). Empirical research likewise confirms that severity of punishment, beyond a certain point, does not produce additional deterrence — what deters is *certainty* of punishment, not duration. *See United States v. Bannister*, 786 F. Supp. 2d at 691 (citing deterrence research). Even a substantially reduced sentence is more than sufficient to deter Mr. Lamm from any future criminal conduct.

*Public Protection.* Mr. Lamm is a first-time offender. He has been adequately deterred by the ruin his conduct has visited upon his life and his family. Upon completion of any sentence imposed, he will be physically removed from the United States and will have forfeited his right to lawfully return for the remainder of his life. PSR ¶¶ 97–98. He poses no risk whatsoever to the

American public after his removal — he will literally not be present in the country. *See United States v. Lopez,* 366 F.3d 1166, 1170 (10th Cir. 2004) (recognizing that alienage status and ineligibility for prison programs affect the protection-of-the-public calculus).

***Rehabilitation and Just Punishment.*** The Court is required to consider rehabilitation as a sentencing purpose under § 3553(a)(2)(D). *Tapia v. United States*, 564 U.S. 319, 325 (2011). Mr. Lamm's record shows extraordinary rehabilitative promise: he has accepted responsibility immediately and completely; he has pursued education and vocational training notwithstanding his disability; he has built two operating small businesses; he has young children who depend on him; and he has expressed genuine, documented remorse. *See Pepper,* 562 U.S. at 491 (rehabilitation evidence is among the most relevant § 3553(a) considerations).

### 5. Bureau of Prisons Issues Unique to Mr. Lamm's Status as a Removable Alien.

Mr. Lamm is the subject of an immigration detainer (PSR ¶ 49), and the Probation Officer has recommended that he be surrendered to U.S. Immigration and Customs Enforcement for removal upon completion of his term of imprisonment (PSR ¶¶ 97–98). His removable-alien status carries a series of significant collateral consequences that are not reflected in the advisory guideline range and that this Court may consider in fashioning a downward variance:

First, the Bureau of Prisons encourages family visitation to maintain inmate morale. *See* BOP Program Statement 5267.09. Because the BOP does not contemplate Mr. Lamm's eventual release into the United States, it has no obligation to designate him close to family. He could be designated to a facility remote from the Bahamas, making it materially more difficult for his mother, two minor children, and siblings to maintain meaningful contact during his incarceration.

Second, as a deportable alien, Mr. Lamm will be ineligible for placement in a low-security camp; for the Residential Drug Abuse Program (RDAP) and its associated early-release benefits;

and for early release to a community corrections facility. *See* 18 U.S.C. § 3624. Eleventh Circuit and other courts have recognized that loss of these benefits — which a comparable U.S.-citizen defendant would receive — is a proper § 3553(a) consideration. *See United States v. Smith,* 27 F.3d 649, 655 (D.C. Cir. 1994); *United States v. Mendoza-Mendoza*, 597 F.3d 212, 217 (4th Cir. 2010).

Third — and most acute — incarceration poses a *medical* risk to Mr. Lamm that a non-disabled defendant would not face. As detailed at PSR ¶ 51, Mr. Lamm's current prosthesis no longer fits him; his gait is impaired, with the threat of permanent secondary hip injury; bone is protruding from the residual limb; he experiences ongoing nerve and phantom pain; and the Broward County Jail is presently providing only over-the-counter Tylenol for that pain. The clinical trajectory documented in the PSR is unambiguous: without prompt access to a qualified prosthetist for a refit, ongoing residual-limb care, and appropriate pain management, the bone protrusion will worsen, the soft-tissue covering of the stump will break down, and the probable corrective intervention is a *revision amputation above the knee* — meaning that Mr. Lamm, who has already lost his right leg below the knee, may lose still more of it.

The Bureau of Prisons is poorly positioned to deliver the specialized, ongoing prosthetic and orthopedic care Mr. Lamm requires. The BOP does not staff prosthetists in-house at most facilities; specialty consults must be arranged through outside contractors, with frequent delays. As an immigration detainee designated to a low-security facility, Mr. Lamm will not have the access to outside specialists or to continuity-of-care providers that a U.S.-citizen defendant on parole-eligible status might enjoy. Federal courts and the Department of Justice's own Office of the Inspector General have repeatedly documented the inadequacy of BOP medical care for inmates with complex orthopedic and amputation-related needs. *See, e.g., United States v. Martin,*

363 F.3d 25, 49–50 (1st Cir. 2004) (recognizing that BOP medical care may be inadequate for serious medical conditions, supporting downward variance); *United States v. Gee*, 226 F.3d 885, 902 (7th Cir. 2000) (same); *see also* Office of the Inspector General, U.S. Dep't of Justice, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (2016) (documenting chronic medical-care delivery gaps in BOP facilities).

The practical consequence is significant. A sentence calibrated to the advisory range will, in real terms, deliver to Mr. Lamm — by reason of his amputation status, the foreseeable deterioration of his residual limb in custody, and the BOP's known limitations in specialized orthopedic and prosthetic care — a punishment materially harsher than the same sentence would impose on a non-disabled defendant. The risk that he will leave BOP custody with materially less of his right leg than he entered with is not speculative; it is the trajectory the medical record, the PSR, and the BOP's own institutional capacity all describe. That asymmetric harm is a proper § 3553(a) consideration. *See Pepper*, 562 U.S. at 480 (sentencing court must possess "the fullest information possible concerning the defendant's life and characteristics"); *Koon*, 518 U.S. at 113 (every defendant is a "unique study"). Mr. Lamm respectfully requests that this Court take account of the medical risk imposed by incarceration in fashioning a sentence below the advisory range, and that the Court further recommend designation to a BOP facility with qualified prosthetic and orthopedic-care capacity.

Fourth, upon physical removal to the Bahamas, Mr. Lamm will have forfeited his right to lawfully return to the United States for the remainder of his life — a punishment that, while collateral, is permanent and substantial.

Taken together, these alienage-related consequences impose a meaningfully more severe sentence on Mr. Lamm than the advisory range would impose on a similarly situated U.S.-citizen defendant. That additional, unaccounted-for punishment is itself a reason for variance.

### 6. The Cumulative Effect of the Mitigating Factors Is Extraordinary.

Although any one of the mitigating factors above might warrant a downward variance, their cumulative impact in this case is extraordinary. Mr. Lamm is, at the age of 24: a permanent below-knee amputee facing the possibility of a revision amputation above the knee; the survivor of the deaths of four of the closest figures in his life — including a brother shot to death at age 24 — all within a three-year span; a documented sufferer of acute anxiety and adjustment disorder; a daily marijuana user who used the substance as a coping mechanism for unresolved trauma; a young father of two infants; a first-time, zero-point offender; an entrepreneur who has built and continues to operate two small businesses despite his disability; and a non-citizen who will be permanently removed from the United States. The cumulative weight of these factors — none of which is reflected in the advisory guideline range — easily clears the threshold for an "extraordinary" case warranting variance under *Gall* and *Kimbrough*. *See Gall*, 552 U.S. at 47 (mitigating factors of varying types may be aggregated).

## VI.    CONCLUSION

Joel Lamm is a young man who, caught in a whirlwind of catastrophic injury, the cascading deaths of beloved family members, and persistent financial hardship, became susceptible to those who recruited him to operate a vessel they owned, transporting cocaine they owned, to a warehouse they owned. He was a hired hand — not a principal. He has accepted responsibility, cooperated immediately and completely, and is deeply remorseful.

The single most consequential ruling this Court will make at sentencing concerns Mr. Lamm's *role*. Probation has refused, in flat tension with Amendment 833 to the United States Sentencing Guidelines, to apply any mitigating-role adjustment. PSR ¶¶ 22, 31. Yet the PSR's own offense-conduct narrative establishes — without dispute — that Mr. Lamm performed a "low-level trafficking function" as that term is now defined in operative guideline text. U.S.S.G. § 2D1.1(e)(2)(B)(i). He operated the vessel. He owned nothing. He held no proprietary interest in the criminal activity and was "simply being paid to perform" a single task — the precise profile the Commentary to § 3B1.2 directs courts to credit. *U.S.S.G. § 3B1.2 cmt. n.3(C)*. Co-defendant Neely owned the vessel, owned the warehouse, owned the cocaine, coordinated the maritime transport, and was found with a loaded firearm. PSR ¶¶ 9–10, 12, 17–19. Probation's refusal to differentiate the courier from the principal cannot be reconciled with Amendment 833's express directive "to encourage broader use of § 3B1.2 in these cases." U.S.S.G. App. C, Amend. 833. Sustaining the mitigating-role objection is what unlocks a guideline range proportionate to Mr. Lamm's actual conduct.

Mr. Lamm therefore respectfully requests that this Honorable Court: (i) sustain the objection to the +2 vessel-captain enhancement at PSR ¶ 28; (ii) sustain the objection to the failure to apply a mitigating-role reduction at PSR ¶¶ 22 and 31, and apply the four-level minimal-role reduction under § 3B1.2(a), together with the corresponding base-offense-level reduction under amended § 2D1.1(a)(5); and (iii) impose a sentence of 30 months' imprisonment, which is at the very bottom of the resulting advisory guideline range of 30 to 37 months (Total Offense Level 19, Criminal History Category I) and is sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553(a)(2).

*The Court can impose 30 months even on a minor-role finding.* Should the Court determine that the minor-role reduction under § 3B1.2(b) is more appropriate than the minimal-role reduction, the resulting advisory range is 46 to 57 months (Total Offense Level 23, Criminal History Category I). Mr. Lamm respectfully submits that the same 30-month sentence is appropriate on that alternative calculation, by way of a downward variance under 18 U.S.C. § 3553(a). The cumulative mitigating factors developed in Section V — Mr. Lamm's permanent below-knee amputation and the foreseeable medical deterioration of his residual limb in BOP custody; the recent trauma chronology (the deaths, in rapid succession, of his maternal grandmother Bernadette Brown, his father Noel Lamm, his older brother Jason Lamm to gun violence at age 24, and his maternal grandfather Ronald Brown); his diagnoses of acute anxiety and adjustment disorder; his complete and immediate acceptance of responsibility; his status as a zero-point, first-time offender; the dramatic § 3553(a)(6) disparity between his conduct and that of co-defendant Neely (who owned the vessel, the warehouse, and the cocaine); and his removable-alien collateral consequences (ineligibility for RDAP and halfway-house benefits, BOP designation away from family in the Bahamas, lifetime bar on lawful reentry) — collectively present an "extraordinary" mitigating profile that easily supports a variance to 30 months. *See Gall*, 552 U.S. at 47, 50; *Kimbrough*, 552 U.S. at 101; *Pepper*, 562 U.S. at 480. Stated differently: at the minimal-role calculation, 30 months is the bottom of the guideline range; at the minor-role calculation, 30 months is the § 3553(a) variance the record supports. Either way, the appropriate sentence is 30 months.

WHEREFORE, based upon the foregoing, Mr. Lamm respectfully requests that this Honorable Court (1) sustain his objections to the +2 vessel-captain enhancement and to the failure to apply a mitigating-role reduction; (2) apply the four-level minimal-role reduction under §

3B1.2(a) and the corresponding base-offense-level reduction under amended § 2D1.1(a)(5); and (3) impose a sentence of 30 months' imprisonment, which represents the bottom of the resulting advisory guideline range and is sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553(a)(2). In the alternative, should the Court apply the two-level minor-role reduction under § 3B1.2(b), Mr. Lamm respectfully requests a downward variance under § 3553(a) to the same 30-month sentence. Counsel thanks this Court for its consideration of these Objections and Sentencing Memorandum and will have further remarks at the time of sentencing.

Dated: _____, 2026.

Respectfully submitted,

/s/ David W. Macey
David W. Macey, Esq.
Florida Bar No.: 185612
135 San Lorenzo Avenue, PH-830
Coral Gables, FL 33146
Telephone: (305) 860-2562
Facsimile: (305) 675-5841
Email: dm@davidmacey.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _____ day of _____, 2026, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will electronically serve copies on all counsel of record.

/s/ David W. Macey
David W. Macey, Esq.